# EXHIBIT 1

FILED
7/24/2019 2:13 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019L008162

5828859

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

ERIC HESTRUP, individually and on behalf
of all others similarly situated,

        *Plaintiff,*

    v.

H.D. SMITH, LLC, and SMITH MEDICAL
PARTNERS, LLC,

        *Defendants.*

Case No.    2019L008162

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Ashley Keller (IL 6300171)
ack@kellerlenkner.com
Seth Meyer (IL 6324349)
sam@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
Tel: 312.741.5220
Firm ID: 63925

William S. Consovoy*
will@consovoymccarthy.com
J. Michael Connolly*
mike@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
Tel: 703.243.9423

James Young*
jyoung@ForThePeople.com
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
76 South Laura Street, Suite 1100
Jacksonville, Florida 32202
Tel: 904.398.2722

Juan Martinez*
juanmartinez@ForThePeople.com
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: 813.223.5505

*Pro Hac Vice* admission to be sought

*Counsel for Plaintiff and the Putative Class*

FILED DATE: 7/24/2019 2:13 PM  2019L008162

FILED DATE: 7/24/2019 2:13 PM    2019L008162

Plaintiff Eric Hestrup ("Plaintiff") is a natural person and resident of Illinois. Plaintiff brings this Class Action Complaint ("Complaint") against Defendants H.D. Smith, LLC and Smith Medical Partners, LLC (collectively "Smith" or "Defendants"), seeking redress for Defendants' alleged illegal acts that have caused Plaintiff's health insurance premiums to increase. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## INTRODUCTION

1.      Prescription opioids have devastated communities across the country and in the State of Illinois. Since 1999, there have been more than 183,000 reported opioid-related deaths nationwide—more than three times the number of U.S. soldiers who died in the Vietnam War. In addition to the tragic loss of life and the heartbreaking impact on children and loved ones, some estimates state that the opioid crisis is costing governmental entities and private companies as much as $500 billion per year.

2.      Smith distributed opioids through a sophisticated closed distribution system, described herein, and had a duty to stop suspicious orders and report diversion. Smith disregarded its own real-time data and failed to report and/or halt red-flagged, facially suspicious orders from pharmacies in Illinois.

3.      The actions of Smith include filling excessive and/or suspicious orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency from Illinois pharmacies for prescription opioids; shipping and/or distributing those excessive quantities of opioid drugs throughout the state; failing to report to appropriate authorities such suspicious orders; and failing to halt such excessive and suspicious shipments. These orders were for such

1

FILED DATE: 7/24/2019 2:13 PM 2019L008162

large quantities of prescription narcotic pain medication that they could have no associated legitimate medical purpose.

4.      Smith distributes prescription opioids that are powerful, highly addictive narcotic drugs, which are derived from or possess properties similar to opium and heroin. These prescription opioids are categorized as "Schedule II" drugs due to their high potential for abuse and potential to cause severe psychological or physiological dependence. The terms "opioids" and "opioid analgesics" describe the entire class of natural and synthetic opiates.

5.      The Food and Drug Administration ("FDA") originally approved opioid treatment for short-term post-surgical or trauma-related pain, and for palliative (end-of-life) care. Later, the labels were extended to reach treatment of patients with "chronic pain," or pain lasting more than three months.

6.      Following the label extension, the companies who manufactured and sold this class of drugs in the United States experienced a boom in their business. However, with this boom came a scourge which infected the country in the form of a public health epidemic caused by widespread addiction to opioids like OxyContin, as well as generic forms of oxycodone and hydrocodone. The scourge is now commonly known as the "opioid epidemic." More of a modern plague, the opioid epidemic continues to mushroom, despite widespread media attention, many states taking action, and a national government response.

7.      While there are many purported causes to the opioid epidemic, this action is focused solely on the actions of a particular group of companies that collectively have been, and continue to be, a dominant pharmaceutical distributor and market leader. Smith could and should have prevented the brunt of the opioid epidemic, but instead allowed the country, including Illinois, to be flooded with prescription opioids. Under federal law, distributors are required to secure and

2

FILED DATE: 7/24/2019 2:13 PM    2019L008162

monitor drugs as they travel through commerce, to protect them from theft, and to reject and report suspicious or unusual orders by downstream pharmacies, doctors, or patients. But Smith neglected this duty, turning a blind eye to known or knowable problems in its own supply chains. By doing so, Smith created conditions in which vast amounts of opioids flowed freely from Smith to abusers and drug dealers—with Smith readily fulfilling suspicious orders from pharmacies and ignoring red flags that would require further investigation and resolution. Smith saturated and flooded Illinois with excessive amounts of dangerous and addictive prescription opioids, while disregarding its own real-time data, customer thresholds, internal reports, and common sense.

8.      During the creation of this epidemic, Smith knew of the dangerous addictive qualities and high rates of loss and misappropriation ("diversion rates") of the opioids it shipped.

9.      Upon information and belief, Smith received millions of dollars per year for distributing excessive volumes of opioids into Illinois. Smith, in order to maintain or increase its profits and market dominance, situated itself to play a significant role in creating the opioid epidemic and its lasting effects on the health costs for residents of Illinois.

10.     Smith's role in the opioid epidemic has created a public health crisis in Illinois. Smith's failure to halt and report suspicious orders created an oversupply of prescription opioids and has provided a source for the illicit use or sale of opioids, which has created a population of addicted and dependent patients in Illinois. When those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin. In addition to the societal impact of deaths, overdoses, and rampant addiction, Smith's conduct has created higher demand—and thus higher prices—for opioids, as well as the need for expensive medical treatment for a number of covered health conditions, resulting in increased insurance costs for Illinois residents.

3

FILED DATE: 7/24/2019 2:13 PM    2019L008162

11.     This behavior by Smith has allowed massive amounts of opioids to be diverted from legitimate channels of distribution into the illicit black market, fueling the opioid epidemic. Smith created an environment in which drug diversion can flourish. For years, Smith has had the ability to substantially reduce the death toll and adverse economic consequences of opioid diversion, but has instead opted to pursue corporate revenues.

12.     Smith's misconduct has fueled opioid addiction, opioid-related deaths, and emergency medical treatments, all while generating huge sales of opioids at inflated prices.

13.     The direct and proximate consequence of Smith's misconduct is that every Illinois purchaser of private health insurance has paid higher premiums, co-payments, and deductibles. Insurance companies have considerable market power, and pass onto their insureds the expected costs of future care—including opioid-related coverage. Accordingly, insurance companies factored in the unwarranted and exorbitant healthcare costs of opioid-related coverage caused by Smith and charged it back to insureds in the form of higher premiums, deductibles, and co-payments.

14.     This action seeks to hold Defendants accountable for the economic harm they have imposed on Illinois purchasers of private health insurance.

## PARTIES

15.     Plaintiff Eric Hestrup is a natural person and resident and citizen of the State of Illinois.

16.     Defendant H.D. Smith, LLC f/k/a H. D. Smith Wholesale Drug Co. is a Delaware corporation with its principal place of business in Illinois. H. D. Smith Wholesale Drug Co. was a Delaware corporation with its principal place of business located in Illinois. H. D. Smith Wholesale Drug Co. has been restructured and is currently doing business as H.D. Smith, LLC.

4

FILED DATE: 7/24/2019 2:13 PM   2019L008162

H.D. Smith, LLC's sole member is H.D. Smith Holdings, LLC, and its sole member in turn is H.D. Smith Holding Company, a Delaware corporation with its principal place of business in Illinois.

17.     Defendant Smith Medical Partners, LLC is a Delaware corporation with its principal place of business in Illinois. Smith Medical Partners, LLC is a wholly owned subsidiary of Defendant H.D. Smith, LLC.

18.     Together, Defendants make up the the largest independent wholesaler of prescription opioids in the United States. During all relevant times, Defendants have sold and continue to sell prescription opioids in and around Illinois.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action because the Defendants' principal places of business are in Illinois, the Defendants conduct substantial business in Illinois, and this lawsuit arises out of acts and/or omissions which occurred in Illinois. For example:

1.     Defendants enter into contracts relating to the subject-matter of this action in the State of Illinois;

2.     Defendants have delivered, distributed, dispensed, and sold opioids in Illinois with the intent and the expectation that those products would be distributed to or purchased by Illinois residents, citizens, and businesses; and

3.     As described herein, Plaintiff sues to vindicate injuries that have occurred within the State of Illinois.

20.     Venue is proper in this Court pursuant to 735 ILCS 5/2-101(2), because the Defendants have their principal places of business in Illinois, and acts and/or omissions which gave rise to this lawsuit occurred in Cook County, Illinois.

21.     The Complaint herein sets forth exclusively state law claims against Smith. Nowhere does Plaintiff plead, expressly or implicitly, any cause of action or request any remedy that arises under or is based on federal law. Plaintiff expressly asserts that the only causes of action

5

FILED DATE: 7/24/2019 2:13 PM 2019L008162

asserted, and the only remedies sought herein, are founded upon the statutory, regulatory, common, and decisional laws of Illinois.

22.     Additionally, federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 is not invoked by the Complaint, as it exclusively sets forth herein viable state law claims against Smith. The issues presented in the allegations of this Complaint do not implicate any substantial federal issues and do not turn on the necessary interpretation of federal law. No federal issue presented in the allegations of this Complaint are important to the federal system as a whole under the criteria set by the Supreme Court in *Gunn v. Minton*, 568 U.S. 251 (2013).

## FACTUAL ALLEGATIONS

23.     The opioid epidemic in America is unparalleled. On August 10, 2017, President Donald Trump declared America's opioid crisis to be a national emergency. According to the Centers for Disease Control ("CDC"), the most recent data estimates that 142 Americans die every day from a drug overdose. Drug overdoses now kill more people than gun homicides and car crashes combined. Between 1999 and 2015, more than 560,000 people in this country died due to drug overdoses. Approximately 6 out of 10 drug overdose deaths are caused by opioids.[1]

24.     Opioids are the prime contributor to the addiction and overdose crisis. In 2015, nearly two-thirds of drug overdoses were linked to opioids like Percocet, OxyContin, heroin, and fentanyl. Americans consume more opioids than any other country in the world. In 2015, the

---

[1] Letter from President's Commission on Combating Drug Addiction and the Opioid Crisis to the President of the United States, Nov. 1, 2017, *available at* https://www.whitehouse.gov/sites/ whitehouse.gov/files/images/Final_Report_Draft_11-1-2017.pdf (last accessed on July 24, 2019).

6

FILED DATE: 7/24/2019 2:13 PM   2019L008162

amount of opioids prescribed in the United States was enough for every American to be medicated around the clock for three weeks.[2]

      25.     Additionally, the Substance Abuse and Mental Health Services Administration ("SAMHSA") Center for Behavioral Health and Statistics Quality ("CBHSQ") reports that four out of every five new heroin users begin with nonmedical use of prescription opioids.[3]

      26.     Similar to states like Ohio, West Virginia, and Kentucky, Illinois has experienced a notable increase in drug overdose deaths that can primarily be attributed to an increase in opioid overdose deaths. Provisional death records data obtained from the Illinois Department of Public Health ("IDPH") show 2,278 drug-related overdose deaths during 2016. This represents a 44.3% increase over the 1,579 drug-related overdose deaths that were reported by IDPH for 2013. This statewide increase in drug-related overdose deaths is almost totally accounted for by an increase in opioid-related overdose deaths. Of the 2,278 Illinois statewide drug overdose deaths during 2016, over 80% were opioid-related fatalities. The 1,826 opioid-related overdose deaths among Illinois residents that have been provisionally reported for 2016 represents an over 70% increase in the number of such deaths that were reported in 2013, and a 32.1% increase over the 1,382 opioid-related overdose that were reported to IDPH for 2015.[4]

---

[2] Centers for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *Opioid Prescribing*, July 6, 2017, *available at* https://www.cdc.gov/vitalsigns/opioids/infographic.html (last accessed July 24, 2019).

[3] Centers for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *Today's Heroin Epidemic*, July 7, 2015, *available at* https://www.cdc.gov/vitalsigns/heroin/index.html (last accessed July 24, 2019).

[4] Illinois Dep't of Human Servs., *The Opioid Crisis in Illinois: Data and the State's Response*, May 16, 2017, *available at* https://www.dhs.state.il.us/OneNetLibrary/27896/documents/ OpioidCrisisInIllinois_051617.pdf (last accessed on July 24, 2019).

FILED DATE: 7/24/2019 2:13 PM  2019L008162

## A. OPIOIDS ARE SCHEDULE II, HIGHLY ADDICTIVE DRUGS, KNOWN TO CAUSE USERS TO DEVELOP DRUG SEEKING BEHAVIORS.

27.     Opioids—once a niche drug—are now the most prescribed class of drugs, above even blood pressure medicine. The cost of the country's opioid crisis is estimated to have exceeded $1 trillion from 2001 to 2017, and is projected to cost an additional $500 billion by 2020.[5]

28.     Prescription opioids bind to receptors on the spinal cord and in the brain, dampening the perception of pain. Like heroin, opioids can create a euphoric high, and thereby possess addictive qualities. At certain doses, opioids can slow the user's breathing, causing respiratory depression and, ultimately, death. With prolonged use, a patient's tolerance increases, causing a correlating increased need in dose amounts and frequency of administration or use. Increased tolerance also increases the risk of significant side effects and addiction rate, as well as decreases the effectiveness of patient weaning.

29.     According to the CDC, the percentage of heroin users who also use opioid pain relievers rose from 20.7% between 2002 and 2004, to 45.2% between 2011 and 2013.[6] More current studies cement the connection between heroin and prescription opioids.[7]

30.     Dr. Robert DuPont, former director of the National Institute on Drug Abuse and the former White House drug czar, opines that opioids are more destructive than crack cocaine:

---

[5] *See* Sarah Litton, *Economic Toll of Opioid Crisis in U.S. Exceeded $1 Trillion Since 2001*, Altarum Center for Value in Health Care, Feb. 13, 2018, *available at* https://altarum.org/news/economic-toll-opioid-crisis-us-exceeded-1-trillion-2001 (last accessed on July 24, 2019).
[6] *See* Christopher M. Jones, et al., *Vital Signs: Demographic and Substance Use Trends Among Heroin Users – United States, 2002-2013*, Centers for Disease Control, July 7, 2015, *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6426a3.htm (last accessed on July 24, 2019).
[7] *See* Wilson M. Compton, et al., *Relationship Between Nonmedical Prescription-Opioid Use and Heroin Use*, 374 N. Eng. J. Med. 154, Jan. 14, 2016, *available at* https://www.nejm.org/doi/10.1056/NEJMra1508490 (last accessed on July 24, 2019).

FILED DATE: 7/24/2019 2:13 PM  2019L008162

"[Opioid abuse] is building more slowly, but it's much larger. And the potential for death, in particular, [is] way beyond anything we saw then. . . . [F]or pain medicine, a one-day dose can be sold on the black market for $100. And a single dose can [be] lethal to a non-patient. There is no other medicine that has those characteristics. And if you think about that combination and the millions of people who are using these medicines, you get some idea of the exposure of the society to the prescription drug problem."[8]

## B. THE ROLE OF PHARMACEUTICAL DISTRIBUTORS.

31.     It's pharmaceutical distributors like Smith, rather than drug manufacturers, that sell opioids directly to physicians or pharmacies for ultimate dispensing. A sophisticated, closed distribution system exists to push these drugs across the nation.[9] This sophisticated system was born out of an acknowledgement by Congress that greater control was needed over abused and addictive prescription drugs, and was intended to track and account for controlled substances from manufacturers to ultimate consumers.[10]

32.     For many important reasons, this system relies upon the honesty, integrity, and accountability of prescription drug distributors to be effective. This closed chain of distribution was specifically designed by Congress to prevent the diversion and abuse that is complained of herein.

33.     States, including Illinois, have enacted similar state laws, rules, and regulations in order to regulate the distribution of drugs and provide oversight to this unique industry. The

---

[8] "Use and Abuse of Prescription Painkillers." *The Diane Rehm Show*, Apr. 21, 2011, *available at* http://thedianerehmshow.org/shows/2011-04-21/use-and-abuse-prescription-painkillers/ transcript (last accessed on July 24, 2019).
[9] Statement of Joseph T. Rannazzasi, Deputy Assistant Administrator, Drug Enforcement Agency to the Department of Justice Before the Caucus on International Narcotics Control, United States House of Representatives Subcommittee on Health Committee on Energy and Commerce, Apr. 7, 2014, *available at* http://docs.house.gov/meetings/IF/IF14/20140407/ 102093/HHRG-113-IF14-Wstate-RannazzisiJ-20140407.pdf. (last accessed on July 24, 2019).
[10] *Id.*

9

FILED DATE: 7/24/2019 2:13 PM    2019L008162

Illinois General Assembly determined and declared that "recognizing the rising incidence in the abuse of drugs and other dangerous substances and its resultant damage to the peace, health, and welfare of the citizens of Illinois, to provide a system of control over the distribution and use of controlled substances which will more effectively: (1) limit access of such substances only to those persons who have demonstrated an appropriate sense of responsibility and have a lawful and legitimate reason to possess them; (2) deter the unlawful and destructive abuse of controlled substances; (3) penalize most heavily the illicit traffickers or profiteers of controlled substances, who propagate and perpetuate the abuse of such substances with reckless disregard for its consumptive consequences upon every element of society . . ." 720 ILCS 570/10.

34.     This closed system of state and federal authority imposes specific duties upon wholesale distributors to monitor, identify, halt, and, perhaps most importantly, report suspicious orders of controlled substances. 21 C.F.R. § 1301.74; *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017). All registrants of the closed distribution system "must adhere to specific security, recordkeeping, monitoring, and reporting requirements that are designed to identify or prevent diversion."[11] The end purpose of these laws is to protect the consuming public.

35.     Pharmaceutical distributors, such as Smith, are one of the key components of this closed distribution chain. The role of the pharmaceutical distributor is not simply one of shelf stocker, freight forwarder, or simple shipper. If the closed system is to function properly, distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.

---

[11] *Id.*

10

FILED DATE: 7/24/2019 2:13 PM 2019L008162

## C. SMITH ENGAGED IN UNLAWFUL AND UNFAIR MISCONDUCT.

36. Smith engaged in misconduct, including its knowing and reckless failure to prevent the rampant diversion of opioids.

1. <u>Smith Had a Duty to Exercise Reasonable Care in Distributing Opioid Drugs.</u>

37. Smith has duties under Illinois common law—as well as federal laws—to exercise reasonable care and not to create a foreseeable risk of harm to others.

38. Smith is also required to comply with the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 et seq., and its implementing regulations, which govern the distribution and dispensing of controlled substances. Among other reasons, Congress passed the CSA to protect against "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market." H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566, 4572.

39. The CSA regulates the distribution of drugs from the manufacturing level through delivery to the patient. Opioid distributors are required to maintain effective controls against opioid diversion. They are also required to create and employ a system to identify and report suspicious orders of controlled substances to law enforcement authorities. Suspicious orders include orders of unusual size or frequency, or otherwise deviating substantially from normal patterns. To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

40. To prevent unauthorized users from obtaining opioids, the CSA created a distribution monitoring system for controlled substances based on the registration and tracking requirements imposed on distributors of controlled substances. The DEA's Automation of Reports and Consolidation Orders System ("ARCOS") is an automated drug reporting system that monitors the flow of Schedule II controlled substances from their point of manufacture through commercial

distribution channels to point of sale. ARCOS accumulates data on distributors' acquisition/distribution transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution. Everyone registered to distribute ARCOS reportable controlled substances is supposed to report acquisition and distribution transactions to the DEA.

41. Acquisition and distribution transaction reports provide data on each acquisition to inventory, identifying whether it is, for example, by purchase, transfer, or return from a customer, and each reduction from inventory, identifying whether it is, for example, by sale, transfer, theft, destruction, or seizure by government agencies. *See* 21 U.S.C. § 827(d)(l); 21 C.F.R. §§ 1304.33(e), (d). Inventory that has been lost or stolen is also reported separately to the DEA within one business day of discovery.

42. In addition to filing acquisition and distribution transaction reports, registrants are required to maintain complete and accurate records of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. *See* 21 U.S.C.§§ 827(a)(3), 1304.21 (a), 1304.22(b). It is unlawful to fail to abide by the recordkeeping and reporting requirements.

43. Distributors of controlled substances also are required to maintain effective controls against diversion of controlled substances into any channels other than those for legitimate medical, scientific, and industrial use. When determining if a distributor has provided effective controls, the DEA Administrator refers to the security requirements set forth in the regulations, which provide standards for the physical security controls and operating procedures necessary to prevent diversion. *See* 21 C.F.R. § 1301.71.

FILED DATE: 7/24/2019 2:13 PM 2019L008162

FILED DATE: 7/24/2019 2:13 PM    2019L008162

44.    Because Smith was already purporting to monitor and report on opioid transactions, its utter failure to take reasonable precautions to ensure the accuracy of its reports was an inexcusable breach of common law duty.

2.    <u>Smith Knowingly or Negligently Facilitated Widespread Diversion of Opioids.</u>

45.    Opioid diversion has been a widely publicized problem for years.   Numerous publications, studies, agencies, and professional organizations have highlighted the dangerous rates of opioid abuse and overdose across the country and in Illinois.

46.    To address the problem of opioid diversion, the DEA has provided guidance to distributors in the form of publications, agency actions, and other documents on the requirements of suspicious order reporting.

47.    For over a decade, the DEA has conducted one-on-one briefings with distributors regarding downstream customer sales and prudent due diligence steps.   The DEA provided distributors with information on controlled substance distribution patterns and trends, including data on order volume, order frequency, and the ratio of controlled to non-controlled purchases. Distributors were also given case studies, legal findings against other registrants, and ARCOS profiles of their customers whose previous purchases may have reflected suspicious ordering patterns.   The DEA highlighted "red flags" that distributors should look for in order to identify potential diversion.   The DEA implemented this initiative to help distributors understand their duties with respect to diversion control.

48.    In addition, the DEA has hosted numerous conferences to provide registrants with updated information about diversion trends and regulatory changes affecting the drug supply chain, the distributor initiative, and suspicious order reporting.   Smith attended these conferences, which also provided opportunities to ask questions and raise concerns.

13

FILED DATE: 7/24/2019 2:13 PM    2019L008162

49.     The DEA also participated in numerous meetings and events with the Healthcare Distribution Management Association ("HDMA"), which is now known as the Healthcare Distribution Alliance ("HDA")—an industry trade association for drug wholesalers and distributors. DEA representatives have provided guidance concerning suspicious order monitoring to the HDA, which has published guidance documents for members on suspicious order monitoring, reporting requirements, and diversion of controlled substances.

50.     In addition, the DEA Office of Diversion Control sent letters dated September 27, 2006 and December 27, 2007 to all registered distributors providing guidance on suspicious order monitoring of controlled substances and the responsibilities of registrants to conduct due diligence on customers of controlled substances.

51.     The September 27, 2006 letter reminded registrants that they are required by law to exercise due diligence to avoid filling orders that may be diverted into the illicit market. It explained that as part of their legal obligation to maintain effective controls against diversion, distributors are required to exercise due care in confirming the legitimacy of all orders prior to filling. It also described indicia of diversion, including orders of excessive quantities of a limited variety of controlled substances, disproportionate ratios of controlled substances to non-controlled prescription drugs, excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs, and orders of the same controlled substance from multiple distributors. The letter went on to describe what questions should be answered by a customer when attempting to determine whether an order is suspicious.

52.     On December 27, 2007, the Office of Diversion Control sent a follow-up letter to DEA registrants providing guidance and reiterating their legal requirements. The letter reminded registrants that suspicious orders must be reported promptly and simply on monthly transaction

14

FILED DATE: 7/24/2019 2:13 PM 2019L008162

reports. It also advised that registrants must perform independent analyses of suspicious orders prior to sale to determine if diversion appears likely, and that filing suspicious order reports and then completing the sales does not absolve registrants from legal responsibility. Finally, the letter directed registrants to review a recent DEA action that addressed criteria in determining suspicious orders and the obligation to maintain effective controls against diversion.

53. Smith was also notified of its responsibilities by its own industry group, the HDMA, which published Industry Compliance Guidelines entitled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," which emphasized the responsibilities of each member of the supply chain in distributing controlled substances. These industry guidelines further stated that, "[A]t the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

54. Smith has acknowledged the magnitude of the problem and its legal responsibilities to prevent diversion, and it has issued statements assuring the public it was supposedly undertaking a duty to curb the opioid epidemic.

**D. SMITH CAUSED OR CONTRIBUTED TO THE OPIOID EPIDEMIC IN ILLINOIS BY OVERSATURATING THE PHARMACEUTICAL MARKET IN FILLING SUSPICIOUS AND FRAUDULENT ORDERS AND FAILING TO REPORT OR HALT THE SAME.**

55. The data collected by distributors and reported to government regulators is often reported in terms of dosage units. A dose is the amount of active ingredient in a particular pill or capsule.

56. The amounts of pills shipped or delivered by Smith to Illinois pharmacies was and is unreasonable, dangerous, and facially suspicious.

15

57.     With the systems and technology used by Smith to collect and analyze robust data, outlined below, Smith had access to information reflecting the full extent of its lethal over-shipments in Illinois. Rather than taking steps to protect the end customer from the massive volume of dangerous and addictive drugs, Smith instead chose to keep the fire hose open and pump addictive pill after addictive pill into the State.

58.     In its position as an opioid distributor, Smith knew or should have known of Illinois's exceedingly high rate of suspicious shipments, and the correlating risk of abuse, misuse, and diversion of prescription opioids. Indeed, the shipments mentioned above, and others, constitute facially suspicious orders to disproportionately small markets. Numerous publications, news sources, and studies highlighted the epidemic rate of opioid abuse and overdose rates in Illinois.

59.     Smith knew, or should have known, that many of the controlled substances that it was providing to customers in the State were being obtained through fraudulent prescriptions from physicians who were prescribing controlled substances for illegitimate medical purposes.

60.     Smith knew, or should have known, it was supplying "pill-mill" pharmacies throughout the State.

61.     Smith knew or should have known that it shipped excessive amounts of suspicious orders of opioids to areas that lacked the population to support the claimed need. Smith shipped these highly addictive prescription opioids to pharmacies in Illinois that were located in sparsely populated areas in such quantities that it knew, or should have known, the drugs were being diverted for illegal use.

62.     Despite an existing duty to the consuming public, and both federal and Illinois law requiring procedural safeguards against diversion of controlled substances, Smith failed to take

FILED DATE: 7/24/2019 2:13 PM   2019L008162

FILED DATE: 7/24/2019 2:13 PM   2019L008162

any action to effectively prevent, minimize, or reduce the distribution or availability of these dangerous drugs.

63.     Smith had a legal duty to ensure it was not filling suspicious orders that should have simply been refused. However, despite the existence of suspicious orders, and the information available regarding the same through Smith's own sophisticated tracking system, Smith did not refuse to ship or supply the often abused and highly addictive prescription opioids to Illinois pharmacies, between 2007 and the present.

64.     Additionally, Smith knowingly failed to report suspicious orders in Illinois from 2007 to the present. This business practice was and is unfair and unconscionable, deceptive, and/or misleading.

65.     Smith's intentional distribution of enormous quantities of prescription opioids throughout Illinois's small rural communities and towns showed a reckless disregard for the health and safety of Illinois's citizens.

66.     Smith played a key part in the creation, proliferation, and continuation of the opioid epidemic and the resulting and continuing catastrophic damage in the State of Illinois.

67.     Specifically, Smith shipped millions of doses of highly addictive controlled painkillers into Illinois, many of which should have been stopped and/or investigated as suspicious orders. This business practice was and is unfair and unconscionable, deceptive, and/or misleading.

68.     Illinois has been devastated by the opioid epidemic and the epidemic has not abated. Cook County, Illinois reported 1081 opioid-related overdose deaths in 2016 alone, with 741 in Chicago and 340 in suburban Cook County.[12]

---

[12] *See* Cook County Dep't of Public Health, City of Chicago, *Opioid-Related Overdose Deaths in Cook County, IL 2016*, Jan. 2018, *available at* https://www.chicago.gov/content/dam/city/depts/

FILED DATE: 7/24/2019 2:13 PM   2019L008162

69.     Illinois Department of Public Health data shows 2,278 drug-related overdose deaths during 2016. This represents a 44.3% increase over the 1,579 drug-related overdose deaths that were reported by IDPH for 2013.[13]

70.     Of the 2,278 Illinois statewide drug overdose deaths during 2016, over 80% (1,826) were opioid-related fatalities.

71.     The 1,826 opioid related overdose deaths during 2016 represent an over 70% increase in the number of such deaths that were reported in 2013, and a 32.1% increase over the 1,382 opioid-related overdose that were reported by IDPH for 2015. The number of Emergency Medical Service ("EMS") runs that required two Naloxone administrations increased by over 50% from 2013-2015, and the number of runs that required three administrations increased by over 75% during this time period. This increase can be attributed to the presence of fentanyl and other synthetic opioids in the substances being used.

72.     Upon information and belief, Smith failed to maintain effective controls against diversion throughout its distribution in Illinois.

73.     Upon and information and belief, Smith derived millions of dollars of income from the controlled substances it shipped into the State.

## E. ILLINOIS PURCHASERS OF HEALTH-CARE INSURANCE HAVE SUSTAINED SUBSTANTIAL HARM DUE TO THE DEFENDANTS' MISCONDUCT.

74.     Health insurance is an individual or group policy that provides coverage for hospital, medical, surgical, and/or prescription drug benefits.

---

cdph/tobacco_alchohol_and_drug_abuse/2016_JtCookCountyChgo_OpioidBrief_Jan302018.pdf (last accessed on July 24, 2019).
[13] See n.4, supra.

18

FILED DATE: 7/24/2019 2:13 PM    2019L008162

75.    Smith's misconduct has increased Plaintiff's cost of private health insurance in Illinois.

76.    In Illinois, the cost of coverage has increased significantly over the past few years. In 2018, insurers increased rates on average by 5% to 38% for the lowest-priced plans on the exchange in Illinois.[14]  In 2018, Blue Cross and Blue Shield of Illinois's parent company, Health Care Service Corporation, posted a profit of $4.1 billion.[15]

77.    Over one-third (34%) of Illinois residents had coverage from at least one public program, while 59 percent (59%) were insured by private or commercial coverage ("group participants") at some point in 2017.[16]

78.    In 2014, private insurance accounted for $40 billion of Illinois' $106 billion in total health care spending.  As is true throughout the country, health care costs in Illinois have risen at a rate significantly higher than the overall rate of inflation.  From 2004 to 2014, Illinoisans spent an average of 4.4% more each year on health care: $5,362 per person in 2004 compared to $8,262 per person in 2014.  Insurance premiums—the fees paid to get and keep insurance—have risen at an even more alarming clip.  In 2003, average annual health insurance premiums for family coverage were $9,693; in 2016, an average family plan cost Illinoisans $1,634 per month—or a

---

[14] Centers for Medicare & Medicaid Servs., U.S. Dep't of Health and Human Servs., *Average Monthly Premiums for Second-Lowest Cost Silver Plan and Lowest Cost Plan for States Using the HealthCare.gov Platform, 2016–2019*, Oct. 11, 2018, *available at* https://www.cms.gov/ sites/drupal/files/2018-10/10-11-18%20Average%20Monthly%20Premiums%20for%20SLCSP %20and%20LCP%202016-2019.pdf (last accessed on July 24, 2019).

[15] *See* Lisa Schenckner, *Think health insurance is too costly? The parent of Blue Cross Blue Shield of Illinois made $4.1 billion last year*. Chicago Tribune, Mar. 10, 2019, *available at* https://www.chicagotribune.com/business/ct-biz-blue-cross-triples-profit-20190312-story.html (last accessed on July 24, 2019).

[16] *See* Henry J. Kaiser Family Foundation, *Health Coverage of the Total Population*, *available at* https://www.kff.org/other/state-indicator/total-population (last accessed July 24, 2019).

19

FILED DATE: 7/24/2019 2:13 PM 2019L008162

staggering $18,510 in annual premiums. This 91% increase represents an average year-over-year increase of 7%—more than three times the average Consumer Price Index over the same period.

79. Group participants may pay all or part of their premiums directly, or their employers may pay all or part of their premiums directly. Individual purchasers (or members of their family) pay the entire premium directly. The "deductible" in a health-insurance plan is the amount the insured must pay each period (usually annually) before insurance starts to cover healthcare costs. A "co-pay" is a flat amount the insured pays per claim, such as a doctor visit or prescription. "Co-insurance" is the percentage of a bill that the insured pays under some plans after the deductible is met. Deductibles and co-payments often are higher under individual plans.

80. As a direct and proximate result of the conduct described herein, natural and corporate persons have sustained losses and injuries in the form of higher premiums, deductibles, and co-payments/co-insurance. Health care insurers in Illinois have paid (and expect to continue to pay) substantial amounts for opioid prescriptions that would never have been prescribed and/or filled absent Smith's misconduct, and have also paid (and expect to continue to pay) substantial amounts for treatment of individuals who became addicted to opioids and/or who became addicted to heroin or other drugs because of opioid use. Many of those individuals who became addicted to opioids—or who became addicted to heroin or other drugs because of opioid use—would never have become addicted or even received access to opioids absent Smith's conduct described herein. These insurers have also paid for numerous other costs proximately caused by Smith's conduct, including care for babies born addicted to opioids, emergency-room treatments, and other claims.

81. Plaintiff purchasers of private health insurance have been damaged as a result of paying prices that are higher as a direct result of Smith's misconduct. Illinois health insurers are easily able to—and do—pass higher costs onto their insureds. Premiums in health insurance

20

FILED DATE: 7/24/2019 2:13 PM    2019L008162

markets do not reflect individual differences in costs, meaning that all insureds bear higher costs inflicted by the highest-risk insureds.

82. In Illinois, as in most other states, insurers charge premiums based on assigned rate classes, a pool of insured individuals with similar health status. Because the premium charged is uniform for the entire risk class, excessive claims experienced by others raise premiums for everyone. This empirical reality makes economic sense. Insurers cannot know ex ante if an individual insured will take and become addicted to opioids, with the corresponding costs that ensue for that patient. So insurers charge every insured a higher premium—including the majority of insureds who never take opioids—to pay for the risk of future, opioid-related claims.

83. This is partially because insured patients with opioid abuse or dependence diagnoses cost health insurers more than average patients, in Illinois and nationwide. In 2015, total annual per-patient charges (the costs of providing a health service) and allowed amounts (the maximum an insurer will pay for a covered health service) for services for patients with opioid abuse and dependence diagnoses were 550% higher than for the average insured patient.

84. Thus, as the opioid crisis has barreled forward across the country and in Illinois, so has the pressure on insurance companies to raise premiums. Indeed, by one estimate, private insurance claims related to opioid dependence rose by an astonishing 3,200% nationwide from 2007 to 2014, and upon information and belief by a comparable percentage in Illinois, with the brunt of this burden falling on those aged 19 to 35. This makes sense in light of the demonstrated increase in opioid-related emergency room visits and treatment center admissions, along with the growth in the percentage of privately insured Americans and Illinoisans over this period. Similarly, professional charges and allowed amounts grew by over 1,000% for patients diagnosed

21

with opioid abuse or dependence from 2011 to 2015, further increasing insurance companies' incentive to increase their customers' rates.

85.    The costs that Smith's conduct inflicted on the insurance market cannot be, and have not been, confined to opioid users because of such risk pooling. Empirical evidence evaluated by leading economists confirms this common-sense conclusion. In addition, many of the costs that Smith has inflicted on the health system involve risks that insurers may not refuse to cover as a matter of law and regulation, since Illinois is like "all states [that] have mandated certain benefits that must be included in the health insurance package of that state, most commonly for substance abuse." Jonathan Gruber and Helen Levy, *The Evolution of Medical Spending Risk*, JOURNAL OF ECONOMIC PERSPECTIVES, 23(4), pp. 25-48, at 32 (2009).

## F.  DEFENDANTS ACTED WANTONLY, WILLFULLY, OUTRAGEOUSLY, AND WITH RECKLESS DISREGARD FOR THE CONSEQUENCES OF THEIR ACTIONS.

86.    When engaging in the conduct described herein, Smith acted wantonly, willfully, outrageously, and with reckless disregard for the consequences of its actions.

87.    Smith knew and should have known about the harms that its unlawful and unfair business practices have caused and continue to cause in Illinois. Smith closely monitored its distribution rates and orders. All this time, it turned a blind eye and failed to report suspicious orders, which undoubtedly would have, at minimum, slowed to growth of the opioid epidemic.

88.    At all relevant times, Smith knew that the likely consequences of its actions would be that millions of individuals would become addicted to opioids and other drugs, which in turn would destroy countless families and communities across the nation and in Illinois, while imposing tremendous medical and other costs that would be borne by all purchasers of health insurance.

22

FILED DATE: 7/24/2019 2:13 PM    2019L008162

89.    Despite this knowledge, Smith engaged in the conduct described herein for the purpose of obtaining billions of dollars in windfall profits, while destroying the lives of countless Illinoisans.

90.    While insurance companies may refuse to cover ineffective or dangerous treatments, they too were misled by Smith's pervasive campaign to convince the healthcare industry that opioids were effective and necessary for long-term pain management.  Insurers paid Smith for the care ordered by patients' doctors, as well as for the resulting costs of addiction: treatment, emergency-room care, and other claims.  Those costs were ultimately passed along to Plaintiff and all Class members.

## FACTS SPECIFIC TO PLAINTIFF

91.    Plaintiff Eric Hestrup is a natural person and resident and citizen of the State of Illinois.

92.    Plaintiff purchases health insurance for him and his family through a group health plan offered by Plaintiff's employer, from Blue Cross Blue Shield of Illinois.

## CLASS ALLEGATIONS

93.    **Class Definition**: Plaintiff brings this action pursuant to Section 2-801 of the Illinois Code of Civil Procedure on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All current Illinois citizens (including natural persons and entities) who purchased and paid premiums for health insurance policies in Illinois governed by Illinois law from 1996 through the present; and all current Illinois citizens who paid for any portion of employer-provided health insurance governed by Illinois law from 1996 through the present.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest

23

FILED DATE: 7/24/2019 2:13 PM 2019L008162

and their current, former, purported, and alleged employees, officers, and directors; (3) counsel for Plaintiff and Defendants; (4) persons who properly execute and file a timely request for exclusion from the Class; (5) the legal representatives, successors, or assigns of any such excluded persons; and (6) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendants.

94. **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder is impracticable. As of 2017, the National Center for Health Statistics estimated that approximately 70 percent (70%) of people in Illinois have enrolled in private health insurance. Ultimately, the Class members will be easily identified through third-party business records.

95. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not necessarily limited to the following:

- whether Smith was negligent in the distribution of its products;

- whether Smith acted in violation of Illinois law;

- whether the Class is entitled to restitution and/or disgorgement, or as a substitute for, damages under Illinois law; and

- whether Plaintiff is entitled to damages and/or injunctive relief.

96. **Fair and Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the other Class members. Plaintiff's claims are typical of the claims of all the other Class members, and Plaintiff is dedicated to vindicating the rights of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on

24

behalf of the Class members and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other Class members.

97.     **Appropriateness**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by individual Class members will likely be relatively small compared to the burden and expense of individual prosecution of the complex litigation necessitated by Smith's actions. Thus, it would be virtually impossible for individual Class members to obtain effective relief from Smith's misconduct. Even if Class members could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions ensured.

98.     Smith acted and failed to act on grounds generally applicable to Plaintiff and the other Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class.

99.     Plaintiff reserves the right to revise the Class Definition and Class Allegations based on further investigation, including facts learned in discovery.

## CAUSES OF ACTION

### COUNT I
### Violation of Illinois Consumer Fraud and Deceptive Practices Act,
### 815 ILCS 505/1, *et seq.*

100.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

101.    Plaintiff brings this Count on behalf of all members of the Class.

102.    The Illinois Consumer Fraud and Deceptive Practices Act ("ICFDPA"), 815 ILCS 505/2, prohibits any person from engaging in, "deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce…whether any person has in fact been misled, deceived or damaged thereby."

103.    Plaintiff and Class members, as purchasers of health insurance, are consumers within the meaning of the ICFDPA.

104.    Defendants, as distributors of pharmaceuticals, were conducting trade and commerce within the meaning of the ICFDPA during the period described in this Complaint.

105.    Defendants violated the ICFDPA because they engaged in unfair methods of competition, unfair acts and practices, and deceptive acts and practices in Illinois, as set forth above.

106.    Smith's business practices of failing to halt and report suspicious orders, as described in this Complaint, constitute the concealment, suppression, or omission of a material fact, which violates Illinois law because the deceptive practices deceived doctors, insurers, and

26

FILED DATE: 7/24/2019 2:13 PM   2019L008162

consumers in Illinois, led to the sale of opioids that should not have been sold, and thereby caused Plaintiff and Class members to pay higher insurance premiums.

107.    Smith was in the position to implement effective business practices to guard against diversion of the highly addictive opioid products it sells and distributes. By failing to halt and report suspicious orders, Smith profited off the opioid epidemic, while burdening Illinois consumers by its conduct and profiting from the sale of prescription opioids in quantities that far exceeded the number of prescriptions that could reasonably have been used for legitimate medical purposes, despite having notice or actual knowledge of widespread opioid diversion from prescribing records, pharmacy orders, site visits and sales representatives. Smith's omissions, which are deceptive and misleading in their own right, were a direct cause of the increase in insurance premiums for Illinois residents. All of this conduct, separately and collectively, was likely to deceive Illinois doctors, who prescribed opioids based on Smith's deception, and insurers who purchased, or covered the costs for the purchase of, opioids for chronic pain.

108.    Smith's conduct constitutes an unlawful, unfair or fraudulent business practice, including its filling of suspicious or invalid orders for prescription opioids at both the wholesale and retail level; failing to maintain effective controls against opioid diversion; failing to operate an effective system to disclose suspicious orders of controlled substances; failing to report suspicious orders of controlled substances; failing to reasonably maintain necessary records of opioid transactions; and deliberately ignoring questionable and/or obviously invalid prescriptions and filling them anyway—all while purporting to have world-class and compliant systems, controls, and practices in place.

27

FILED DATE: 7/24/2019 2:13 PM   2019L008162

109.    Smith's conduct violates public policy, including the Controlled Substances Act, the Illinois Controlled Substances Act, and the Illinois insurance fraud statute, 720 ILCS § 5/17-10.5, because the harm these acts cause to Illinois consumers greatly outweighs any benefit.

110.    Smith's fraudulent, unlawful, and/or deceptive activity alleged herein is immoral, unethical, oppressive, and unscrupulous because Plaintiff and Class members had no choice but to submit to it: Smith needlessly drove up costs and caused insurance premiums to rise. Plaintiff and Class members were forced to either internalize the costs of Smith's conduct, or not purchase health insurance, exposing themselves to tremendous risk, as well as penalties under the Affordable Care Act.

111.    All of Smith's unfair, unlawful, and/or deceptive activity alleged herein caused insurers to pay for ineffective and dangerous treatments, as well as the increased costs associated with opioid addition. These costs were passed on to Plaintiff and the members of the Class in the form of increased premiums.

112.    As a direct and proximate result of the foregoing acts and omissions, Smith has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations described in this Complaint.

113.    Smith's conduct caused substantial injury to consumers, including the increased insurance premiums paid by Plaintiff and the Class.

114.    Plaintiff, on behalf of himself and the Class, seeks actual damages pursuant to 815 ILCS 505/10a.

## COUNT II
### Public Nuisance

115.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

28

116.    Illinois law prohibits a defendant from causing "an unreasonable interference with a right common to the general public."

117.    Smith has intentionally, recklessly, or negligently engaged in conduct or omissions which have substantially created or assisted in the creation of a condition that is injurious to the health and interferes with the comfortable enjoyment of life and property of entire communities or neighborhoods or of any considerable number of persons in Illinois.

118.    The public nuisance is substantial and unreasonable. Smith's actions caused and continue to cause the public health epidemic described above, and that harm outweighs any offsetting benefit.

119.    Smith's conduct has persisted over a long period of time and caused widespread harm. It has caused deaths, serious injuries, and a severe disruption of public peace, order, safety, and other rights common to the general public; it is ongoing, and it is producing permanent and long-lasting damage.

120.    Smith knew and should have known that the rampant diversion of opioids that it enabled would create or assist in the creation of the public nuisance—*i.e.,* the opioid epidemic. Smith's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. Its actions were, at the very least, a substantial factor in the widespread diversion of opioids throughout Illinois.

121.    Without Smith's actions or omissions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

29

FILED DATE: 7/24/2019 2:13 PM    2019L008162

122.     The public nuisance—*i.e.*, the opioid epidemic—created, perpetuated, and maintained by Smith, can be abated and further recurrence of such harm and inconvenience can be abated.

123.     Smith's actions have increased the cost of insuring individuals, and Plaintiff and Class members—who pay insurance premiums—are injured.

124.     Plaintiff and Class members suffered particular harm as purchasers of health insurance distinguishable from the harm suffered by the general public as a result of that public nuisance.

125.     Plaintiff requests an order providing for abatement of the public nuisance that Smith created or assisted in the creation of, and enjoining Smith from future violations of Illinois law.

## COUNT III
## Unjust Enrichment

126.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

127.     To the detriment of Plaintiff and Class members, Smith has been, and continues to be, unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.

128.     Smith has voluntarily accepted and retained the windfall of inflated prices paid for its opioid products with full knowledge that it was not lawfully entitled to it.

129.     Plaintiff and Class members bear the costs of the benefits conveyed to Smith in the form of increased insurance premiums.

130.     Between Smith and Plaintiff/Class members, it would be unjust for Smith to retain the benefits attained by its wrongful actions.

131.     Smith has been unjustly enriched, in the form of inflated prices for its prescription opioids, at the expense of Plaintiff and Class members who are entitled in equity to disgorgement

FILED DATE: 7/24/2019 2:13 PM   2019L008162

and restitution of Smith's wrongful profits, revenue, and benefits, to the extent, and in the amount deemed appropriate by the Court, and any other relief the Court deems just and proper to remedy Smith's unjust enrichment.

## COUNT IV
### Negligence

132.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

133.    Smith has a duty to exercise reasonable care in distributing highly dangerous medications in the State of Illinois.

134.    Smith owes that duty to Plaintiff and Class members. Defendants' profits as distributors are inextricably bound with the industry of health insurance, and any reasonably prudent distributor is aware of the basic mechanics of the insurance industry by which costs are passed on to others in a risk pool through premiums.

135.    Smith knew and should have known that allowing the diversion of opioids would cause significant costs to consumers, insurers, and insurance customers.

136.    Smith breached its duty to Plaintiff and Class members by failing to halt and report suspicious orders.

137.    Smith's conduct caused opioids to become widely available and widely used, and Smith's actions were, at the very least, a substantial factor in the widespread abuse of opioids. Without Smith's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

138.    As described above, Smith's breach caused and proximately caused damages to Plaintiff and Class members.

31

## COUNT V
## Civil Conspiracy

139. Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

140. As set forth above, Smith committed torts against Plaintiff and the Class members, including violations of the ICFDPA, public nuisance, and negligence.

141. Throughout the opioid epidemic, Smith has continued to supply prescription opioids. This supply has continued despite Smith's having actual or constructive knowledge that it was habitually breaching its common law and statutory duties.

142. Smith would not have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of other opioid distributors and manufacturers.

143. Smith, in a scheme to market and expand the sales of its opioid products, conspired with other drug distributors and manufacturers to create the scenario where sales of its opioid products would lead to widespread opioid use, misuse, abuse, and addition, resulting in the opioid epidemic that now exists across the United States and in Illinois.

144. As a result of this concerted action, Illinois law was continually violated by the provision of opioids through Smith's supply chain.

145. Smith and other drug distributors and manufacturers formed an agreement to commit the aforementioned overt and unlawful acts in a common scheme.

146. Smith performed overt acts in support of the conspiracy that were tortious and unlawful.

147. The unlawful actions of Smith and other drug distributors and manufacturers have resulted in extensive damages to Plaintiff and other Class members—in the form of increased health insurance premiums—for which Smith should be liable.

32

**PRAYER FOR RELIEF**

148.     Plaintiff, on behalf of himself and the Class, respectfully requests that this Court enter an Order:

149.     Declaring that the claims brought by Plaintiff may be maintained as a class action;

150.     Declaring that the Defendants have engaged in unlawful, fraudulent, deceptive, and unconscionable business acts and practices in violation of the Illinois Consumer Fraud and Deceptive Practices Act;

151.     Ordering the Defendants to pay restitution of any money acquired by their unlawful, fraudulent, deceptive, and unconscionable business practices;

152.     Declaring that the Defendants have created a public nuisance and enjoining the Defendants to abate the public nuisance that they created;

153.     Declaring that the Defendants have been unjustly enriched by their conduct;

154.     Ordering the Defendants to pay restitution of all benefits and disgorge all profits unjustly retained by the Defendants;

155.     Declaring that the Defendants have acted negligently;

156.     Ordering the Defendants to pay all damages caused to Plaintiff and Class members by their negligent actions;

157.     Declaring that the Defendants have engaged in a civil conspiracy;

158.     Ordering the Defendants to pay all damages caused to Plaintiff and Class members by Defendants and their coconspirators;

159.     Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

33

FILED DATE: 7/24/2019 2:13 PM 2019L008162

160.     Awarding Plaintiff and the members of the Class their reasonable litigation expenses and attorneys' fees;

161.     Awarding Plaintiff and the members of the Class pre- and post-judgment interest, to the extent allowable; and

162.     Awarding such other and further relief as equity and justice may require.

## JURY TRIAL DEMANDED

163.     Plaintiff demands a jury trial for all claims so triable.

34

FILED DATE: 7/24/2019 2:13 PM    2019L008162

Respectfully submitted,

**ERIC HESTRUP,** individually and on behalf of all others similarly situated,

Dated: July 24, 2019

By: /s/ Seth Meyer
One of Plaintiff's Attorneys

Ashley Keller (IL 6300171)
ack@kellerlenkner.com
Seth Meyer (IL 6324349)
sam@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
Tel: 312.741.5220
Firm ID: 63925

William S. Consovoy*
will@consovoymccarthy.com
J. Michael Connolly*
mike@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
Tel: 703.243.9423

James Young*
jyoung@ForThePeople.com
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
76 South Laura Street, Suite 1100
Jacksonville, Florida 32202
Tel: 904.398.2722

Juan Martinez*
juanmartinez@ForThePeople.com
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: 813.223.5505

*Pro Hac Vice* admission to be sought

*Counsel for Plaintiff and the Putative Class*

35

 **CT Corporation**

**Service of Process Transmittal**
08/05/2019
CT Log Number 535998903

TO: Elizabeth Campbell, Associate General Counsel
AmerisourceBergen Corporation
227 Washington Street
Conshohocken, PA 19428

RE: **Process Served in Illinois**

FOR: H. D. SMITH, LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | ERIC HESTRUP, etc., Pltf. vs. H.D. SMITH, LLC and SMITH MEDICAL PARTNERS, LLC, Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Cook County Circuit Court - County Department - Law Division, IL<br>Case # 2019L008162 |
| **NATURE OF ACTION:** | Class Action Complaint And Demand For Jury Trial |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Chicago, IL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/05/2019 at 15:04 |
| **JURISDICTION SERVED :** | Illinois |
| **APPEARANCE OR ANSWER DUE:** | within thirty (30) days after service of this Summons, not counting the day of service |
| **ATTORNEY(S) / SENDER(S):** | Seth Meyer<br>Keller Lenkner LL<br>150 N. Riverside Plaza, Suite 4270<br>Chicago, IL 60606<br>312-741-5220 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/06/2019, Expected Purge Date: 08/11/2019 |
| | Image SOP |
| | Email Notification,  John Chou  jchou@amerisourcebergen.com |
| | Email Notification,  Susan Coldren  scoldren@amerisourcebergen.com |
| | Email Notification,  Elizabeth Campbell  ECampbell@amerisourcebergen.com |
| | Email Notification,  Katherine (Kat) Tamulonis  Ktamulonis@amerisourcebergen.com |
| | Email Notification,  Michele F. Conte  MConte@amerisourcebergen.com |
| | Email Notification,  Patricia Pellegrini  PPellegrini@amerisourcebergen.com |

Page 1 of  2 / JS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 **CT Corporation**

**Service of Process Transmittal**
08/05/2019
CT Log Number 535998903

**TO:** Elizabeth Campbell, Associate General Counsel
AmerisourceBergen Corporation
227 Washington Street
Conshohocken, PA 19428

**RE:** **Process Served in Illinois**

**FOR:** H. D. SMITH, LLC  (Domestic State: DE)

Email Notification,  Christopher Casalenuovo
 CCasalenuovo@amerisourcebergen.com

Email Notification,  Brian Kabosius  bkabosius@AmerisourceBergen.com

Email Notification,  Carolyn Ellis  cellis@AmerisourceBergen.com

Email Notification,  Andrew Schinzel  aschinzel@amerisourcebergen.com

Email Notification,  Kristin Hinchman  khinchman@amerisourcebergen.com

Email Notification,  Jennifer Healey  jhealey@amerisourcebergen.com

Email Notification,  CHRISSIE MELTON  cmelton@amerisourcebergen.com

**SIGNED:** C T Corporation System
**ADDRESS:** 208 South LaSalle Street
Suite 814
Chicago, IL 60604
**TELEPHONE:** 312-345-4336

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

FILED
7/31/2019 3:46 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

2019L008162

2120 - Served           2121 - Served
2220 - Not Served     2221 - Not Served
2320 - Served By Mail   2321 - Served By Mail
2420 - Served By Publication   2421 - Served By Publication
Summons - Alias Summons                 (08/01/18) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Eric Hestrup

(Name all parties)

v.

Case No.    2019L008162

H.D. Smith, LLC; Smith Medical Partners, LLC

☑SUMMONS    ☐ALIAS SUMMONS

To each Defendant:

Please serve: H.D. Smith, LLC, c/o Registered Agent: CT Corporation System, 208 S. LaSalle St., Ste. 814, Chicago, IL 60604

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Summons - Alias Summons**                                    **(08/01/18) CCG 0001 B**

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first
create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm
to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://
www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

7/31/2019 3:46 PM DOROTHY BROWN

Atty. No.: 63925

Witness: _____

Atty Name: Seth Meyer

Atty. for: Plaintiff Eric Hestrup

Address: 150 N. Riverside Plaza, Suite 4270          DOROTHY BROWN, Clerk of Court

City: Chicago

State: IL   Zip: 60606                               Date of Service: _____
                                                     (To be inserted by officer on copy left with
Telephone: 312-741-5220                              Defendant or other person):

Primary Email: sam@kellerlenkner.com

FILED DATE: 7/31/2019 3:46 PM   2019L008162

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

# CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

FILED DATE: 7/31/2019 3:46 PM · 2019L008162

◉ Richard J Daley Center
50 W Washington
Chicago, IL 60602

○ District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

○ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

○ District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

○ District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

○ District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

○ Domestic Violence Court
555 W Harrison
Chicago, IL 60607

○ Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

○ Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

## Daley Center Divisions/Departments

○ Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

**DIE DATE**
8/25/2019

DOC.TYPE: LAW
CASE NUMBER: 2019L008162

**DEFENDANT**
HD SMITH LLC
208 S LASALLE ST
CHICAGO, IL 60604

SERVICE INF

FILED
7/31/2019 3:46 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

2019L008162

2120 - Served          2121 - Served
2220 - Not Served     2221 - Not Served
2320 - Served By Mail   2321 - Served By Mail
2420 - Served By Publication   2421 - Served By Publication
Summons - Alias Summons                       (08/01/18) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Eric Hestrup

(Name all parties)     Case No.    2019L008162

v.

H.D. Smith, LLC; Smith Medical Partners, LLC

### ☑SUMMONS    ☐ALIAS SUMMONS

To each Defendant:

Please serve: H.D. Smith, LLC, c/o Registered Agent: CT Corporation System, 208 S. LaSalle St., Ste. 814, Chicago, IL 60604

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 3

FILED DATE: 7/31/2019 3:46 PM   2019L008162

**Summons - Alias Summons**                              (08/01/18) CCG 0001 B

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

7/31/2019 3:46 PM DOROTHY BROWN

Atty. No.: 63925

Atty Name: Seth Meyer

Atty. for: Plaintiff Eric Hestrup

Address: 150 N. Riverside Plaza, Suite 4270

City: Chicago

State: IL    Zip: 60606

Telephone: 312-741-5220

Primary Email: sam@kellerlenkner.com

Witness: _____

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

FILED DATE: 7/31/2019 3:46 PM   2019L008162

⦿  Richard J Daley Center
    50 W Washington
    Chicago, IL 60602

○  District 2 - Skokie
    5600 Old Orchard Rd
    Skokie, IL 60077

○  District 3 - Rolling Meadows
    2121 Euclid
    Rolling Meadows, IL 60008

○  District 4 - Maywood
    1500 Maybrook Ave
    Maywood, IL 60153

○  District 5 - Bridgeview
    10220 S 76th Ave
    Bridgeview, IL 60455

○  District 6 - Markham
    16501 S Kedzie Pkwy
    Markham, IL 60428

○  Domestic Violence Court
    555 W Harrison
    Chicago, IL 60607

○  Juvenile Center Building
    2245 W Ogden Ave, Rm 13
    Chicago, IL 60602

○  Criminal Court Building
    2650 S California Ave, Rm 526
    Chicago, IL 60608

### Daley Center Divisions/Departments

○  Civil Division
    Richard J Daley Center
    50 W Washington, Rm 601
    Chicago, IL 60602
    Hours: 8:30 am - 4:30 pm

○  Chancery Division
    Richard J Daley Center
    50 W Washington, Rm 802
    Chicago, IL 60602
    Hours: 8:30 am - 4:30 pm

○  Domestic Relations Division
    Richard J Daley Center
    50 W Washington, Rm 802
    Chicago, IL 60602
    Hours: 8:30 am - 4:30 pm

○  Civil Appeals
    Richard J Daley Center
    50 W Washington, Rm 801
    Chicago, IL 60602
    Hours: 8:30 am - 4:30 pm

○  Criminal Department
    Richard J Daley Center
    50 W Washington, Rm 1006
    Chicago, IL 60602
    Hours: 8:30 am - 4:30 pm

○  County Division
    Richard J Daley Center
    50 W Washington, Rm 1202
    Chicago, IL 60602
    Hours: 8:30 am - 4:30 pm

○  Probate Division
    Richard J Daley Center
    50 W Washington, Rm 1202
    Chicago, IL 60602
    Hours: 8:30 am - 4:30 pm

○  Law Division
    Richard J Daley Center
    50 W Washington, Rm 801
    Chicago, IL 60602
    Hours: 8:30 am - 4:30 pm

○  Traffic Division
    Richard J Daley Center
    50 W Washington, Lower Level
    Chicago, IL 60602
    Hours: 8:30 am - 4:30 pm

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

**DIE DATE**
8/25/2019

DOC.TYPE: LAW
CASE NUMBER: 2019L008162

**DEFENDANT**

HD SMITH LLC                    SERVICE INF
208 S LASALLE ST
CHICAGO, IL 60604

 **CT Corporation**

**Service of Process Transmittal**
08/05/2019
CT Log Number 535998953

| | |
|---|---|
| **TO:** | Elizabeth Campbell, Associate General Counsel<br>AmerisourceBergen Corporation<br>227 Washington Street<br>Conshohocken, PA 19428 |
| **RE:** | **Process Served in Illinois** |
| **FOR:** | SMITH MEDICAL PARTNERS LLC  (Domestic State: DE) |

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | ERIC HESTRUP, etc., Pltf. vs. H.D. SMITH, LLC, and SMITH MEDICAL PARTNERS, LLC, Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Cook County Circuit Court - County Department - Law Division, IL<br>Case # 2019L008162 |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - opioids |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Chicago, IL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/05/2019 at 15:04 |
| **JURISDICTION SERVED :** | Illinois |
| **APPEARANCE OR ANSWER DUE:** | within thirty (30) days after service of this Summons, not counting the day of service. |
| **ATTORNEY(S) / SENDER(S):** | Seth Meyer<br>Keller Lenkner LLC<br>150 N. Riverside Plaza, Suite 4270<br>Chicago, IL 60606<br>312-741-5220 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/06/2019, Expected Purge Date: 08/11/2019<br><br>Image SOP<br><br>Email Notification,  John Chou  jchou@amerisourcebergen.com<br><br>Email Notification,  Susan Coldren  scoldren@amerisourcebergen.com<br><br>Email Notification,  Elizabeth Campbell  ECampbell@amerisourcebergen.com<br><br>Email Notification,  Katherine (Kat) Tamulonis  Ktamulonis@amerisourcebergen.com<br><br>Email Notification,  Michele F. Conte  MConte@amerisourcebergen.com<br><br>Email Notification,  Patricia Pellegrini  PPellegrini@amerisourcebergen.com |

Page 1 of  2 / JS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 **CT Corporation**

**Service of Process Transmittal**
08/05/2019
CT Log Number 535998953

**TO:** Elizabeth Campbell, Associate General Counsel
AmerisourceBergen Corporation
227 Washington Street
Conshohocken, PA 19428

**RE:** **Process Served in Illinois**

**FOR:** SMITH MEDICAL PARTNERS LLC  (Domestic State: DE)

Email Notification,  Christopher Casalenuovo
CCasalenuovo@amerisourcebergen.com

Email Notification,  Brian Kabosius  bkabosius@AmerisourceBergen.com

Email Notification,  Carolyn Ellis  cellis@AmerisourceBergen.com

Email Notification,  Andrew Schinzel  aschinzel@amerisourcebergen.com

Email Notification,  Kristin Hinchman  khinchman@amerisourcebergen.com

Email Notification,  Jennifer Healey  jhealey@amerisourcebergen.com

Email Notification,  CHRISSIE MELTON  cmelton@amerisourcebergen.com

**SIGNED:** C T Corporation System
**ADDRESS:** 208 South LaSalle Street
Suite 814
Chicago, IL 60604
**TELEPHONE:** 312-345-4336

Page 2 of  2 / JS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

FILED DATE: 7/31/2019 3:46 PM   2019L008162

FILED
7/31/2019 3:46 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

2019L008162

| 2120 - Served | 2121 - Served |
|---|---|
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |

Summons - Alias Summons                                    (08/01/18) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Eric Hestrup

(Name all parties)          Case No.    2019L008162

v.

H.D. Smith, LLC; Smith Medical Partners, LLC

### ☑SUMMONS   ☐ALIAS SUMMONS

To each Defendant:

Please serve: Smith Medical Partners, LLC, c/o Registered Agent: CT Corporation System, 208 S. LaSalle St., Ste. 814, Chicago, IL 60604

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Summons - Alias Summons**                                   (08/01/18) CCG 0001 B

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first
create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm
to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://
www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

7/31/2019 3:46 PM DOROTHY BROWN

Atty. No.: 63925

Witness: _____

Atty Name: Seth Meyer

Atty. for: Plaintiff Eric Hestrup

DOROTHY BROWN, Clerk of Court

Address: 150 N. Riverside Plaza, Suite 4270

City: Chicago

Date of Service: _____

State: IL    Zip: 60606

(To be inserted by officer on copy left with
Defendant or other person):

Telephone: 312-741-5220

Primary Email: sam@kellerlenkner.com

FILED DATE: 7/31/2019 3:46 PM 2019L008162

# CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

◉ Richard J Daley Center
50 W Washington
Chicago, IL 60602

○ District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

○ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

○ District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

○ District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

○ District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

○ Domestic Violence Court
555 W Harrison
Chicago, IL 60607

○ Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

○ Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

## Daley Center Divisions/Departments

○ Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

```
*500016 51
```

DOC.TYPE: LAW

CASE NUMBER: 2019L008162

**DEFENDANT**

SMITH MEDICAL PARTNERS LLC

208 LASALLE ST

CHICAGO, IL 60604

**DIE DATE**
8/25/2019

SERVICE INF

FILED
7/31/2019 3:46 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

2019L008162

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| Summons - Alias Summons | (08/01/18) CCG 0001 A |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Eric Hestrup

(Name all parties)    Case No.    2019L008162

v.

H.D. Smith, LLC; Smith Medical Partners, LLC

### ☑SUMMONS    ☐ALIAS SUMMONS

To each Defendant:

Please serve: Smith Medical Partners, LLC, c/o Registered Agent: CT Corporation System, 208 S. LaSalle St., Ste. 814, Chicago, IL 60604

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

**Summons - Alias Summons**                                    (08/01/18) CCG 0001 B

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first
create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm
to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://
www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

FILED DATE: 7/31/2019 3:46 PM  2019L008162

7/31/2019 3:46 PM DOROTHY BROWN

Atty. No.: 63925

Atty Name: Seth Meyer

Atty. for: Plaintiff Eric Hestrup

Address: 150 N. Riverside Plaza, Suite 4270

City: Chicago

State: IL   Zip: 60606

Telephone: 312-741-5220

Primary Email: sam@kellerlenkner.com

Witness: _____

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with
Defendant or other person):

FILED DATE: 7/31/2019 3:46 PM   2019L008162

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

- ◉ Richard J Daley Center
  50 W Washington
  Chicago, IL 60602

- ○ District 2 - Skokie
  5600 Old Orchard Rd
  Skokie, IL 60077

- ○ District 3 - Rolling Meadows
  2121 Euclid
  Rolling Meadows, IL 60008

- ○ District 4 - Maywood
  1500 Maybrook Ave
  Maywood, IL 60153

- ○ District 5 - Bridgeview
  10220 S 76th Ave
  Bridgeview, IL 60455

- ○ District 6 - Markham
  16501 S Kedzie Pkwy
  Markham, IL 60428

- ○ Domestic Violence Court
  555 W Harrison
  Chicago, IL 60607

- ○ Juvenile Center Building
  2245 W Ogden Ave, Rm 13
  Chicago, IL 60602

- ○ Criminal Court Building
  2650 S California Ave, Rm 526
  Chicago, IL 60608

### Daley Center Divisions/Departments

- ○ Civil Division
  Richard J Daley Center
  50 W Washington, Rm 601
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Chancery Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Domestic Relations Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Civil Appeals
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Criminal Department
  Richard J Daley Center
  50 W Washington, Rm 1006
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ County Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Probate Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Law Division
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Traffic Division
  Richard J Daley Center
  50 W Washington, Lower Level
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

**DIE DATE**
**8/25/2019**

*5 0 0 0 1 6 5 1*

DOC.TYPE: LAW
CASE NUMBER: 2019L008162
**DEFENDANT**                    SERVICE INF
SMITH MEDICAL PARTNERS LLC
208 LASALLE ST
CHICAGO, IL 60604